IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                      ) | 2:11-CR-291-KOB-HGD |
| ) | |
| SOLOMON O'CONNER FLOWERS ) | |

**MEMORANDUM OPINION**

This case is before the court on the Defendant's Motion to Suppress (Doc. 25), requesting an order suppressing (1) all physical evidence obtained from the Defendant's residence during a warrantless search on July 3, 2011, and (2) all statements obtained from the Defendant following that search and seizure. The Government filed a timely response to this motion (Doc. 33), and the court heard testimony and oral arguments on the motion on October 6, 2011. At the request of the court, the Defendant and the Government filed supplemental briefs on October 12, 2011 (Docs. 36, 38). For the reasons outlined below, the court concludes that the motion to suppress physical evidence is due to be GRANTED IN PART and DENIED IN PART; and the motion to suppress statements made by the defendant is due to be DENIED.

**I.  FACTS**

In the early hours of July 3, 2011, Solomon Flowers, then 19-years-old, attempted suicide by one or more self-inflicted cuts. Solomon's parents, Michael and Patricia Flowers, discovered Solomon on the bathroom floor in the basement apartment of their Homewood, Alabama, residence. Solomon remained conscious but was experiencing dramatic blood loss. At 1:44 A.M., Michael Flowers dialed 911. Mr. Flowers explained to the operator that his son had attempted suicide and required immediate medical attention. At 1:52 A.M., paramedics, fire

1

personnel, and law enforcement arrived on the scene. Mr. Flowers met the responders at the street and directed them to the basement apartment entrance in the rear of the home, where Solomon lived.

Officers Blackmon and Jones of the Homewood Police Department entered first. According to both officers, standard procedure dictates that, when responding to a suicide call, police enter first to ensure the safety of the scene. To that end, Officer Blackmon crossed through the basement's small living area. Beyond a desk, Officer Blackmon observed Solomon, covered in blood and wrapped in a blanket, lying across the threshold between the living room and the bathroom. Seeing no immediate hazard or potential perpetrator, Officer Blackmon signaled for the paramedics to enter and begin treatment. To make way for the paramedics, Officer Blackmon backed toward the rear of the apartment (away from the door through which he entered and beyond the bathroom area where Solomon lay); he stood flush with the door to another basement room, which he testified was slightly ajar. Officer Jones remained in the living area of the basement closer to the entry and spoke with Mrs. Flowers.

The testimonies of Officers Blackmon and Jones conflict over the timing of events that immediately followed. Both officers concur that shortly after initiating treatment of Solomon, the paramedics moved him from the bathroom door area to a more open space in front of the desk. Officer Blackmon indicated that, upon this move, he backed through the door behind him to visually sweep the additional room and confirm its safety. Officer Jones, on the other hand, testified that Officer Blackmon entered the additional room as the paramedics were wheeling Solomon out of the apartment on a gurney.

This discrepancy aside, paramedics ultimately stabilized Solomon. At 2:20 A.M., an

ambulance transported Solomon to a local hospital, and Mr. and Mrs. Flowers followed. At or before this point, Officer Blackmon entered the back room of the basement apartment. Inside the room, Officer Blackmon observed "grow lights" and other equipment often used to grow marijuana, as well as a suspicious object in the far corner, which he initially believed to be a methamphetamine lab. Walking further into the room for a closer inspection of the object in the corner, Officer Blackmon observed components and connections characteristic of an improvised explosive device ("IED"). Officer Blackmon then summoned Officer Jones, who is a trained bomb technician. Officer Jones confirmed that the device was, in fact, an IED, and he ordered the area to be cleared. Before stepping outside to call for assistance, Officer Jones manipulated the device to render it safe from detonation by static electricity or radio frequencies.

On his way out of the basement apartment, Officer Jones observed a black shopping bag on a shelf by the entry door. According to Officer Jones, a battery dangled from the bag and a switch protruded from its top. Suspecting the bag contained another IED, Officer Jones carefully removed the bag from the shelf, took it outside to a make-shift "safe zone," and initiated contact with the relevant state and local authorities. At 2:48 A.M., Jefferson County Special Operations ("JCSO") dispatched a bomb technician to the Flowers home.

In the hours that followed, Homewood police officers, along with officials from JCSO and the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), searched the remainder of Solomon's basement apartment for other potentially destructive devices or hazardous materials. In total, officials identified and rendered safe four individual IEDs of varying size and sophistication.

After Officer Jones, JCSO, and ATF completed their search of the basement, Homewood

Detective Juan Rodriquez met with Mr. and Mrs. Flowers at the hospital where Solomon was being treated. Detective Rodriquez explained the findings of the basement search and requested a waiver to search the remainder of the property. Mr. Flowers signed the consent form at 9:23 A.M. The search of the Flowerses' primary quarters revealed no additional destructive devices or hazardous materials.

Neither the Defendant nor the Government offered any testimony or arguments concerning statements Solomon may have made presumably while being treated at the hospital.

## II. LEGAL STANDARD

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. Amend. IV. Explaining the contemporary implications of this fundamental protection, the United States Supreme Court declared that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1985). As a result, the Constitution imposes a bright-line rule: "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 749 (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).

Courts have, over time, embraced very few rebuttals to this presumption, and courts universally agree that the Government bears the burden of proving an exception to the warrant requirement. *See, e.g.*, *United States v. Jeffers*, 342 U.S. 48, 51 (1951). Generally, an exception to the warrant requirement arises when exigent circumstances exist in addition to probable cause. *See, e.g.*, *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). Probable cause, which is otherwise required to obtain a warrant, exists where the facts would cause a reasonably cautious person to

believe the objects sought in connection with a crime will be found. *See, e.g.*, *United States v. Blasco*, 702 F.2d 1315, 1324 (11th Cir. 1983). Beyond probable cause, courts have identified exigent circumstances in limited situations where the process of obtaining a warrant is neither feasible nor advisable, including "danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002) (citations omitted).

Distinct from the pairing of exigent circumstances and probable cause, the United States Supreme Court has also affirmed the practice of "protective sweeps" by law enforcement agents in some circumstances. According to the Court, "a 'protective sweep' is a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). During a protective sweep, law enforcement officials may seize items in plain view *if* the seizing officer has probable cause to believe the item is evidence of a crime. *See id.* at 330 (citing *Arizona v. Hicks*, 480 U.S. 321, 326 (1987)).

### III.  DISCUSSION

As noted, the Defendant has moved to suppress (1) all physical evidence obtained from his residence during the warrantless search on July 3, 2011, and (2) all statements obtained from him following that search and seizure. In response, the Government contends that the search and seizure were permitted under both the exigent circumstances and protective sweep exceptions. According to the Government, exigent circumstances arose as a result of the 911 call from Mr. Flowers in which he reported an attempted suicide, and those exigent circumstances continued

through Solomon's emergency medical treatment in, and removal from, the Flowers home. In the alternative, the Government represents that the police were performing a protective sweep of the scene, incident to observation of a lone individual suffering a violent injury. In turn, the Defendant argues that (1) the protective sweep doctrine does not apply absent an arrest, and (2) the exigent circumstances arising from the 911 call by Mr. Flowers, if any, concluded when Officer Blackmon identified no immediate threat to the paramedics and permitted them to begin treatment of Solomon's injuries.

A.     **Application of the Protective Sweep Doctrine**

As a threshold matter, the court finds that the protective sweep doctrine, as currently developed, is inapplicable to these facts. While the United States Supreme Court *has not expressly limited* the scope of protective sweeps to only those situations connected with an arrest, the Court has *not expressly extended* the doctrine to validate a warrantless search absent at least a pending arrest. *See Buie*, 494 U.S. at 327 (defining a protective sweep in a fact-specific context as "a quick and limited search of premises, *incident to an arrest* and conducted to protect the safety of police officers or others....") (emphasis added); *Cf. Martins v. United States*, 546 U.S. 1011 (2005) (denying *certiorari* to a First Circuit case in which the circuit court affirmed a conviction based on evidence seized during a protective sweep incident to a 911 call reporting a gun-shot related medical emergency).

Because the Fourth Amendment compels great deference to the presumption that warrantless searches are unreasonable by default, this court is unwilling to extend the permissible scope of a protective sweep without definitive guidance from a binding authority. Lacking any argument rooted in such an authority, the Government has failed to demonstrate that any of the

evidence in question was legally obtained under the auspices of a protective sweep.

B.     **Application of the Exigent Circumstances Doctrine**

Another exception to the warrant requirement arises when exigent circumstances coexist with probable cause. The Government correctly cites *United States v. Holloway,* 290 F.3d 1331 (11th Cir. 2002), as a seminal case on exigent circumstances in the Eleventh Circuit; yet, the Government stretches the logic of *Holloway* to unreasonable conclusions on both the permissible scope and the permissible timing of warrantless searches.

*Holloway* reinforces the long-observed principle that when responding to an emergency situation, police are required to "act quickly, based on hurried and incomplete information." 290 F.3d at 1339 (citations omitted). By extension, courts are compelled to evaluate the legality of police actions "by reference to the circumstances then confronting the officer, including the need for prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Id.* Based on these premises, the court in *Holloway* affirmed a conviction for unlawful possession of a firearm based on evidence gathered by police during a response to two 911 calls, both of which reported arguing and shots fired in the same small-town Alabama home. On the scene, police placed the defendant, his wife, and their neighbor under control. In so doing, an officer observed shotgun shells on defendant's front porch. Without a warrant, police entered the defendant's home to search for potential victims and weapons. Just inside, police seized a Remington rifle after finding it in plain view. Pairing the contents of the 911 call with the findings on the scene, the Eleventh Circuit upheld the warrantless search without reservation. *Id.* at 1334-40.

The apparent leverage extended by *Holloway*, however, must be read alongside the

critical limitations of *Mincey v. Arizona*, 437 U.S. 385 (1978), a case on which the court in *Holloway* heavily relied. 290 F.3d at 1335-36 (citing *Mincey*, 437 U.S. at 387-89, 392-95). In *Mincey*, the United States Supreme Court overturned a narcotics conviction that was based on evidence gathered during a four-day, floor-to-ceiling search of the defendant's apartment, which began following a violent shoot-out with undercover police officers. The Government argued that the search was permissible because the defendant was in custody on murder charges (for the death of one of the undercover policemen). The Court disagreed, holding that the warrantless search violated the defendant's Fourth Amendment rights because it was not "strictly circumscribed by the exigencies which [justified] its initiation." *Mincey*, 437 U.S. at 393 (citations omitted).

In *Holloway*, police entered the defendant's home without a warrant to search for victims, weapons, or additional perpetrators, and in so doing, they found the rifle in plain view. The Eleventh Circuit concluded that the scope of the warrantles search leading to seizure of the rifle was sufficiently circumscribed by the exigencies that justified its initiation—the "high-risk . . . 911 call" reporting gun fire and first-hand observation of shotgun shells on the front porch. *Holloway*, 290 F.3d at 1332. By contrast, in *Mincey*, police searched the defendant's home without a warrant for any and all evidence related to the drug-sting-gone-bad and the subsequent murder of an officer. The United States Supreme Court concluded that the scope of the warrantless search leading to seizure of the narcotics was *not* sufficiently circumscribed by the exigency that justified its initiation—the shoot-out with undercover police officers. *Mincey*, 437 U.S. at 387-95. Read in concert, these conclusions confirm that the exigency arising from a violent crime scene, whether suspected (as in *Holloway*) or known (as in *Mincey*), may permit

8

police to search a person's home for victims, weapons, or perpetrators. That same exigency, however, does not permit an extended search for unrelated evidence not in plain view.

The narrow exception to the warrant requirement articulated in *Holloway*, *Mincey*, and their progeny is rooted in a basic public policy: Fourth Amendment rights to privacy in one's home are secondary only to protection and preservation of human life. As a result, police may enter private property and seize potentially incriminating evidence in plain view in the course of responding to a potentially life-threatening emergency. When the emergency or threat to life concludes, however, so does the exigency authorizing any warrantless search or seizure.

Both cases acknowledge "the right of the police to respond to emergency situations." *Holloway*, 290 F.3d at 1336 (quoting *Mincey*, 437 U.S. at 392-93). Concomitantly, this court does not presume to second-guess the protocol requiring law enforcement to accompany paramedics and fire personnel in responding to 911 calls that report attempted suicides. These calls undoubtedly evince emergency situations, and, generally speaking, police act reasonably in entering a reported suicide scene ahead of any others to ensure the safety of the situation.

The exigent circumstances resulting from the emergency of an attempted suicide, however, are distinctly limited. Unlike *Holloway*, which involved reports of an ongoing domestic disturbance including shots fired, the emergency that Mr. Flowers reported to the 911 operator included no account of gunfire or violent conflict among multiple parties. On the contrary, Mr. Flowers clearly and calmly articulated an emergency involving a single victim suffering a self-inflicted injury. Further, the responding officers in *Holloway* encountered uncooperative parties (ultimately handcuffing the defendant, his wife, and their neighbor), and they identified discharged shotgun shells at the scene before entering the house. 290 F.3d at

9

1333.  Officers Blackmon and Jones, on the other hand, encountered no such signs of combative violence.  In fact, the officers were able to confirm the details of Mr. Flowers's call within seconds of arriving at the Flowers home.  Nothing indicated the call was a rouse to draw the paramedics or the police to harm; nothing reflected foul play necessitating an extended investigation of the scene.

The Government attempts to extend the exigency that confronted Officers Blackmon and Jones beyond the limits of their immediate emergency in both time and in scope.  At a maximum, the exigency arising from Mr. Flowers's 911 call expired when Officers Blackmon and Jones were able to authenticate the substance of the call and determine that the paramedics could safely begin treatment of Solomon's injuries.  By signaling for the paramedics to enter and start working, Officer Blackmon operationally verified the absence of any threat to the safety of the police, the paramedics, or the Flowers family, and he foreclosed any further need to search the basement based on the exigency arising from the 911 call.  While the medical emergency continued, the safety emergency did not.

Sometime *after* the paramedics began treating Solomon, Officer Blackmon pushed open the door to the back room of the apartment.  When he walked into the room, Officer Blackmon discovered the first allegedly destructive device.  As noted above, Officer Blackmon testified that he entered the room to look for additional victims, a perpetrator, or anything that might pose a risk of harm; yet, Officer Blackmon failed to relate any intervening discovery (akin to the discharged shotgun shells on the porch in *Holloway*) that might lead a reasonable person to believe that additional victims, a perpetrator, or any agent of harm were present in the back room.  Not only did no intervening discovery justify entering the room, Officer Blackmon's actions went

further than necessary to observe whether any additional victim or perpetrator was in the unfurnished, practically empty room; a mere visual sweep of the room would have sufficed.

In the language of *Mincey*, Officer Blackmon's search of the back room was not sufficiently circumscribed to the exigency that justified his initial warrantless entry into the apartment—the limited safety emergency arising from a 911 call that reported an attempted suicide. Officer Blackmon unlawfully entered the back room, and he unlawfully seized the device found in the corner.

Officers Blackmon and Jones, helped by a host of federal and local specialists, later discovered two more allegedly destructive devices in a thorough search of the basement apartment. This search is directly analogous to the search denounced in *Mincey*. As in *Mincey*, the Government here argues that the search was lawful simply because the police were, at one point, rightfully present at what later became a crime scene (a murder scene in *Mincey*; an "IED" scene in the instant case). To validate the exhaustive search of Solomon's apartment based solely on this information, however, would affirm the premise that suspected criminals forfeit the reasonable expectation of privacy afforded by the Fourth Amendment. The Supreme Court in *Mincey* declined to carve a "murder scene" exception out of the Fourth Amendment, even where police officers witnessed the murder first-hand and placed the suspect in custody. 437 U.S. at 395. This court declines to acknowledge any similar "IED scene" exception, as seemingly propounded by the Government, especially given Officer Jones's testimony that the first device, which catalyzed the later, more thorough search, posed no immediate threat of detonation.

Again quoting the *Mincey* standard, Officers Jones and Blackmon acted beyond the exigency that justified their initial warrantless entry into the apartment by directing federal and

11

state officials to exhaustively search the property. Those officials unlawfully engaged the search, and they unlawfully seized two allegedly destructive devices, both in plastic drinking bottles.

The court agrees that Mr. Flowers's 911 call relayed an emergency, which permitted a lawful entry to, and a warrantless search of, Solomon's apartment. The permissible scope of that search, however, was limited to verifying the safety of the scene for the paramedics. Officers Blackmon and Jones, through multiple searches beyond the scope of the exigency, identified all of the evidence in question *after* declaring the immediate area secure. Absent any facts relating a further or compounding emergency, the Government has failed to demonstrate that any of the evidence in question was legally obtained under the auspices of exigent circumstances.

Based on the conclusion that the warrantless searches exceeded the time and scope limitations of the exigency, any discussion of probable cause is moot.

**C.      Absent Exigency, Application of the Plain View Doctrine**

Despite the irrelevance of the protective sweep and exigent circumstances doctrines, two critical facts remain: (1) Mr. and Mrs. Flowers invited the police into the living area of the basement apartment, and (2) Officer Jones found the IED packaged in the black shopping bag in this area in plain view.

Courts have long held that, when lawfully present in a private home, law enforcement may seize evidence in plain view if the incriminating nature of the object seized is immediately apparent. *Horton v. California*, 496 U.S. 128, 133-34 (1990); *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). The Defendant does not contest that Mr. and Mrs. Flowers invited the police into the front room of their basement apartment to aid treatment of Solomon's injuries. As such, Officers Blackmon and Jones were rightfully present without a warrant in the front room of

the basement, even following the conclusion of the safety emergency.

Officer Jones saw and identified the IED packaged in the black shopping bag on a shelf in the front room of the basement, the same room where Solomon had been treated and into which the Flowers invited him and Officer Blackmon. Given this placement, the bag was in plain view. While the dangerous construction and composition of the item (i.e., the item's incriminating nature) may not have been immediately apparent to an ordinary patrol officer, Officer Jones, who is an experienced bomb technician, readily observed its suspicious components—a battery dangling from the side and a switch protruding from the top. To his trained eye, the item was both dangerous and incriminating. Because the item was (1) in an area where the police were lawfully present and (2) in plain view, Officer Jones lawfully seized the IED packaged in the black shopping bag.[1]

## IV. CONCLUSION

For the foregoing reasons, this court concludes that law enforcement officers unlawfully searched the back room of the Defendant's apartment and, as a result of those searches, unlawfully seized three allegedly destructive devices. These unlawful searches and seizures were carried out in violation of the rights afforded the Defendant by the Fourth Amendment to the United States Constitution. However, this court further concludes that law enforcement officers lawfully seized one allegedly destructive device packaged in a black shopping bag and discovered in plain view in the living area. This court finds no evidence offered in support of the

---

[1] To the extent the Government may argue that the "plain view" discovery of the IED bag alone justified the extensive search of the entire basement apartment, the court disagrees. With all occupants out of the house at the hospital, the police had the opportunity to secure the property and obtain a search warrant based on probable cause. Failure to do so negates the protection afforded by the Fourth Amendment.

motion to dismiss any statements made by the Defendant.

As a result of these conclusions, the Defendant's Motion to Suppress is due to be GRANTED IN PART and DENIED IN PART.  Specifically, the motion is due to be GRANTED with respect to the evidence found in the back room of the Defendant's apartment and as a result of the ensuing unlawful search:  (a) the device packaged in a metal computer case (pictured in Government's Ex. 22); (b) the device containing an orange liquid and packaged in a drinking bottle (pictured in Government's Ex. 24); and (c) the device containing a clear liquid and packaged in a drinking bottle (pictured in Government's Ex. 26).  The motion is due to be DENIED with respect to (a) the device packaged in a black shopping bag found in plain view (pictured in Government's Ex. 27) and (b) any statements made by the Defendant following the search and seizure. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 15th day of November 2011.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE